IN
THE

TENTH
COURT OF APPEALS

_______________

                       

                                       No.
10-02-00221-CR

 

        GONZALES
BAIL BONDS,

 

                                                                             Appellant

        v.

 

        THE STATE
OF TEXAS, 

 

                                                                             Appellee

 

_____________________

                           

From the 54th District Court

McLennan County, Texas

Trial Court No. 2001-3574-2

 



O p i n i o n



 

            Gonzales Bail Bonds appeals the granting of the
State’s summary judgment motion forfeiting a bail bond executed by Gonzales and
the principal, Fernando Rico Rodriguez, Jr. 
Gonzales contends in its sole issue that the court erred in granting the
summary judgment motion because Gonzales raised a fact issue on each element of
its affirmative defense that it is exonerated from liability due to the State’s
failure to indict Rodriguez at the next term of court after he was released on
bond.  Because the evidence in the
summary judgment record raises a fact issue as to each element of Gonzales’s affirmative
defense, we will reverse and remand.

          As the non-movant, Gonzales had the burden to produce
sufficient evidence to raise a fact issue on each element of the affirmative
defense of exoneration.  See Hill
v. State, 955 S.W.2d 96, 101 (Tex. Crim. App. 1997).  We indulge every reasonable inference in the
non-movant’s favor and likewise resolve all doubts in its favor.  Id.

The
elements of Gonzales’s affirmative defense are: (1) “[f]ailure to present an
indictment or information at the first term of the court which may be held
after the principal has been admitted to bail,” (2) the principal “was bound
over before indictment or information,” and (3) the prosecution was not
“continued by order of the court.”  Tex. Code Crim. Proc. Ann. art.
22.13(a)(4) (Vernon Supp. 2004); accord Smith v. State, 561 S.W.2d 502, 503 (Tex. Crim. App. [Panel
Op.] 1978); Acevedo v. State, 18
S.W.3d 775, 776 (Tex. App.—San Antonio 2000, pet. ref’d).

The
essential facts are undisputed. 
Rodriguez and Gonzales executed the bail bond in March 2001, during the
March-April 2001 term of the trial court. 
See Tex. Gov't Code Ann.§ 22.156(b) (Vernon 2004).  The State presented an information against
Rodriguez in July 2001, during the July-August 2001 term.  Id.  After
that, Rodriguez made two court appearances. 
He entered a guilty plea on August 23, and he withdrew the guilty plea
on October 9.  After Rodriguez withdrew
his guilty plea, the court set the matter for a pretrial hearing on November
19.  Rodriguez’s failure to appear at the
November 19 pretrial hearing resulted in the forfeiture of the bond.

Gonzales
contends in its sole issue that it raised a genuine issue of material fact as
to each element of its affirmative defense. 
The State responds that Gonzales failed to offer evidence that Rodriguez
“was bound over before indictment or information” or that Rodriguez’s
prosecution was not “continued by order of the court.”  See
Tex. Code Crim. Proc. Ann. art.
22.13(a)(4).  The State responds in the
alternative that Gonzales is liable under theories of ratification or estoppel
because Rodriguez appeared in court twice after the information was filed.

The
bond recites in pertinent part that Rodriguez “is entering into this obligation
binding him to appear before the 54th
Judicial
 District Court of McLennan County, Texas.” 
(emphasis added).  This
constitutes sufficient evidence to raise a fact issue on the question of
whether Rodriguez was “bound over” before the filing of the information.  See
Tex. Code Crim. Proc. Ann. art.
22.01 (Vernon 1989) (providing for forfeiture of bail “[w]hen
a defendant is bound by bail to
appear and fails to appear”) (emphasis added).

Gonzales
states in its summary judgment response that the trial court entered no order
continuing Rodriguez’s prosecution from the March-April 2001 term to any
subsequent term.  The State asked the court
to take judicial notice of the district clerk’s file in the Rodriguez
case.  See Tex. R. Civ. P. 166a
(court shall grant summary judgment if evidence on file at time of hearing
shows that “there is no genuine issue as to any material fact”); Guinn v. Bosque County, 58 S.W.3d 194,
199 (Tex. App.—Waco 2001, pet. denied) (summary judgment record consists of
evidence attached to motion or response).

The
bond required Rodriguez to appear before the 54th District Court.  The file in the Rodriguez case does not
contain an order of the 54th District Court continuing Rodriguez’s prosecution
from the March-April 2001 term to any subsequent term.  Nor does the docket sheet reflect that the
54th  District Court signed
such an order.  Cf. Acevedo, 18 S.W.3d at 776.  Thus, a fact issue remains on the question
of whether Rodriguez’s prosecution was continued by court order from the
March-April 2001 term to any subsequent term.

The
State contends that, even if Gonzales established an entitlement to exoneration
under article 22.13(a)(4), Gonzales remains liable under principles of
ratification or estoppel because of Rodriguez’s subsequent court
appearances.  However, ratification and
estoppel are principles of civil substantive law.  Such principles do not apply in a bond
forfeiture proceeding.  Moore v. State, 828 S.W.2d 497, 498
(Tex. App.—Dallas 1992, pet. ref’d); Lyles
v. State, 814 S.W.2d 411, 412 (Tex. App.—Waco 1991), rev’d on other grounds, 850 S.W.2d 497 (Tex. Crim. App. 1993).

Gonzales
asks that this court reverse the judgment and either render judgment in its
favor or remand this cause to the trial court for further proceedings.  Because Gonzales did not file its own summary
judgment motion, rendition is not proper. 
See Jones v. Strauss, 745
S.W.2d 898, 900 (Tex. 1988); Eastman
Software, Inc. v. Tex. Commerce Bank, N.A., 28 S.W.3d 79, 83-84 (Tex.
App.—Texarkana 2000, pet. denied). 
Accordingly, we reverse the 
judgment and remand this cause to the trial court for further proceedings
consistent with this opinion.  See Hill, 955 S.W.2d at 101.

 

FELIPE REYNA

Justice

Before Chief Justice Gray,

Justice Vance, and

Justice Reyna

(Chief Justice Gray dissenting)

Reversed and remanded

Opinion delivered and filed August
 25, 2004

Publish

[CR25]






 evidenced by a hotel receipt.  Id. at 353. 
She also testified that these acts occurred often, at Phillips’s apartment; no
specific date was provided, but they may have occurred weekly.  Id.  On the third offense, penetration of the victim’s mouth by Phillips’s sexual
organ, the victim testified in detail about one specific instance and “also testified generally that the activity
continued at least intermittently from the summer of 2000 until the spring of
2001.”  Id. at 354.  The trial
court did not require the State to elect.  See id. at 348-49.

The Fourteenth Court held that “clear testimony exist[ed] for two specific
occurrences of both digital and oral penetration, along with further
testimony--often vague on the date, much less vague on describing the
acts--that they often occurred.”  Id.  “[B]oth offenses were described
in detail more than once; yet, it was completely unclear to the jury which act
the State would rely upon for conviction.”  Id.  “This would have
allowed the jury to convict because some of the jurors relied on one offense
and others relied on another.”  Id. at 354.  As for the third offense,
“the jury would have known the specific act on which the State relied” because the
testimony revealed the details of one act performed at a hotel.  Id.  “As to other occurrences, the testimony was only that the behavior was
repeated, without any detail as to how, exactly when, or where.”  Id.  The Court reversed Phillips’s convictions on the first two counts, but not the
third.  See id. at 358.

            Farr was convicted of two counts of
aggravated sexual assault.  See Farr, 140 S.W.3d at 897.  K.R. testified in detail
about four specific acts of oral sex
that occurred in the summer of 2001 and continued for several months.  Id.  She identified what happened during each incident, where in the apartment each
took place, and “a general time line of when the events occurred, sometimes
indicating her age and grade in school, the time of year the incident took
place, or the approximate amount of time that had passed since the previous
incident.”  Id. at 900.  K.R. also testified that Farr “digitally
penetrate[d] her vagina ‘every chance he got.’”  Id. at 897.  The trial
court denied Farr’s request for an election.  See id. at 899.

As to the oral sex offense, the Fourteenth Court held that “it is unclear from the testimony which incident the jury may have
relied upon to convict” because K.R. had testified in detail about four
specific incidents.  Id. at 900.  This created the potential that the
jury might “convict because some of the jurors relied upon one incident and
others relied upon another.”  Id.  As to the digital penetration offense,
K.R. testified “only generally,” stating that Farr “would penetrate her with
his finger ‘every chance he got’”, which “occurred when her mother and her
sister were in other rooms of the apartment.”  Id. at 901.  “She could
not recall how many times these incidents occurred, but stated that they
did not occur in connection with the incidents of oral sex.”  Id.  Due
to the generality of these statements, the Court could not be certain that the
error did not contribute to Farr’s conviction.  Id.  It reversed Farr’s
convictions.  See id.

On appeal, the Court of Criminal Appeals held that
the Fourteenth Court applied the proper harm standard in both cases: “failure
to require the State to elect upon timely request results in constitutional
error, and that the court of appeals was indeed required to reverse the
convictions unless it found beyond a reasonable doubt that the error did not
contribute to the convictions or had but slight effect.”  Phillips, 193 S.W.3d
at 914.  The Fourteenth Court’s judgments were affirmed.  See id.

Dixon
and Hulsey v. State, 211
S.W.3d 853 (Tex. App.—Waco 2006, no pet.) also shed some light on this
issue.  In Dixon, the victim did
not testify about one distinct, detailed incident, but “described the manner in
which appellant sexually assaulted her and said that it occurred numerous
times.”  Dixon, 201 S.W.3d at 734.  Specifically, the victim “related a
sequence of events that occurred every time appellant sexually assaulted her.” 
 Id. at 732.  Dixon would undress, remove the victim’s underwear, touch
her “private parts” with his hand, and touch her “private parts” with his
“private parts.”  Id.  This occurred one hundred times and, with one
exception, always occurred at night.  Id.  The victim provided no other
details.  Id.  Thus, “all
of the incidents presented in the case were presented with equal specificity,
and, except for the fact that one incident occurred during the day, none of the
incidents were distinguished in any manner from each other.”  Id. at 734.  The Court of Criminal Appeals found “beyond a reasonable doubt that the
error in failing to require an election did not contribute to appellant’s
conviction or punishment.”  Id. at 736.

In Hulsey, a jury convicted Hulsey of two counts of sexual
assault, seven counts of indecency with a child by contact, and one count of
indecency with a child by exposure.  See Hulsey,
211 S.W.3d at 855.  Latoya testified
that when she was twelve or thirteen, Hulsey began getting in bed with her and
would lie next to her.  Id. at 856.  He eventually began rubbing her breasts and genitals.  Id.  He did this every morning that he could when Latoya’s mother was at work, more
than ten times and so many times that she could not remember how many.  Id.  Hulsey began having intercourse with Latoya when she was approximately
fifteen.  Id.  Over about a two-year period, Hulsey sexually assaulted
her more than fifty times and that the number may have been one hundred times,
which is what she had told police.  Id.  Latoya’s two sisters also saw
Hulsey on top of Latoya.  Id.  Latoya did not testify to specific
instances of sexual assaults or indecency.  Id. at 855.

The trial court denied Hulsey’s motion to require
the State to elect.  Id.  Hulsey argued that this denial was error
as to two counts of sexual assault and two counts of indecency by contact.  Id.  As to the two counts of indecency by contact with Latoya’s genitals and breast,
we found, beyond a reasonable doubt, that the trial court’s failure to require
the State to elect did not contribute to Hulsey’s conviction or punishment
because Latoya related a sequence of events that occurred every time Hulsey
assaulted her and provided no other details.  Id. at 856 (citing Dixon, 201 S.W.3d at 734-36).  As to the two counts of sexual assault, a specific
incident had been identified for each count; thus, it would have been clear as
to which incidents the State was relying on for conviction.  Id. at 857
(citing Phillips, 130 S.W.3d at 355).    

Unlike the victims in Phillips and Farr,
Brenda did not testify in detail
about any specific incidents of charged conduct.  Thus, the jurors were not
given a choice of incidents from which to choose for conviction on each charged
offense.  Neither was Brenda’s testimony as general as that of the victim in Farr. 
In Farr, K.R. merely testified that the particular offense occurred
“every chance [Farr] got,” that they were alone during the offense, and that the
offenses did not occur during the incidents of oral sex.   Here, as to each
offense, Brenda identified how the offenses occurred, the school year during
which the offenses occurred, where the offenses occurred, what time of day the
offenses occurred, and how often the offenses occurred.  She also provided some
details of what took place during each offense.

Like the victims in Dixon and Hulsey,
Brenda described a sequence of events that occurred each time Jackson committed
a particular offense.  See Dixon, 201 S.W.3d at 732; see also
Hulsey, 211 S.W.3d at 856.  All the incidents for each offense were presented
with equal specificity and, except for the fact that the offenses occurred in
different locations in or around the home or their property, none of the
incidents were distinguished in any manner from each other.  See Dixon, 201 S.W.3d at 734.

Moreover, the unanimity requirement was emphasized
during trial.  In closing, defense counsel reminded the jury that: (1) the
evidence consists of “assaults or indecencies going on over a long period of
time”; (2) “before you can convict Amos [Jackson] of any one of these you’ve
got to unanimously agree that the State has proved one transaction, one event,
beyond a reasonable doubt”; (3) “if the case has been proven on any of these, you’ve
got to agree on one event”; and (4) “you’ve got to agree on a specific event,
that all of the elements of that particular charge are proved beyond a
reasonable doubt on that particular case.”  In its jury charge, the trial court
instructed the jury that before “reaching a verdict of guilty under any
individual indictment tried in this trial, the jury must agree that all of the
elements charged in the individual indictment under consideration occurred in a
single incident in the manner alleged in that individual indictment.”  We cannot say that Jackson was deprived of a
unanimous verdict.  See Dixon, 201 S.W.3d at 735; see
also Hulsey, 211 S.W.3d at 856.  

Neither can we say that Jackson was deprived of
notice or an opportunity to defend against the particular offenses on which the
State intended to rely for conviction.  Other than the locations in the home
where the offenses occurred, there was no distinction between Brenda’s account
of each offense.  See Dixon, 201 S.W.3d at 736.  Jackson was
not deprived of notice or an opportunity to defend.     

In summary, we find, beyond a reasonable doubt,
that the trial court’s failure to force the State to make an election did not
contribute to Jackson’s conviction or punishment.  See Dixon, 201 S.W.3d at 734-36;
see also Hulsey, 211 S.W.3d at 856.  We overrule Jackson’s first issue.

MOTION TO QUASH

            Jackson’s second issue challenges the
denial of his motion to quash the indictments.  We review a trial court’s ruling on a motion to quash an indictment
for abuse of discretion.  State v.
Flournoy, 187 S.W.3d 621, 623 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

            Each indictment charged Jackson with committing an offense that occurred “on or about” a specific date.  Jackson filed a motion to quash the indictments on grounds that each offense was alleged to
have occurred more than once and “it is impossible to know which of the
multiple offenses was the actual offense authorized by the Grand Jury for
prosecution.”  The trial court denied the motion.  On appeal, Jackson contends
that he could not “determine that the offense for which he was convicted was
the very same event or set of facts indicted by the Grand Jury and that at
least nine members of the Grand Jury returning this indictment agreed upon the
same set of facts.”

In Weatherby
v. State, 61 S.W.3d
733 (Tex. App.—Fort Worth 2001, pet. ref’d), Weatherby was charged with
two counts of aggravated sexual assault of a child.  See Weatherby, 61 S.W.3d
at 735.  The first count alleged, “on or about December 24, 1998, aggravated
sexual assault of S.W. by contact of her sexual organ to the mouth or sexual
organ of appellant.”  Id.  The second count alleged indecency with a
child by contact of her breast or genitals, but the jury charge submitted this
count as a lesser included offense of aggravated sexual assault.  Id.  The trial court denied Weatherby’s motion to quash the indictment.  Id.  On appeal, Weatherby argued that “there was no way of knowing whether the grand jury
indicted him on the same facts presented to the petit jury at trial” because the
indictment did not (1) “specifically allege the incident that he was going to
be tried for”; or (2) “specify the acts constituting the alleged offenses.”  Id.  The Fort Worth Court noted that the “indictment tracked the language of the
respective statutes” and that, pretrial, the State had elected a primary
offense.  Id. at 736.  The trial court had “specifically asked the
prosecutor whether that was the offense presented to the grand jury and the
prosecutor responded that there was no evidence to the contrary.”  Id.  Because there was no evidence that the “offenses presented to the grand jury
differed from the offenses proved at trial, the trial court did not abuse its
discretion.”  Id. (citing Sledge v. State, 953 S.W.2d 253, 256 (Tex. Crim.
App. 1997)).

In Sledge, the indictment charged Sledge
with “aggravated sexual assault and indecency with a child, alleging that the
offenses occurred on or about August 31, 1988.”  Sledge, 953 S.W.2d at
254.  Sledge filed a motion requesting notice of extraneous offenses.  Id.  In its response, the State listed “several instances of sexual abuse” and at
the pre-trial hearing, the “State revealed that the conduct of appellant
towards the victim had been continuous over several years.”  Id.  At
Sledge’s request, the State elected to “proceed on two specifically described
episodes which occurred when the child was ten and eleven, because those
incidents were most clear in her mind.”  Id.  On appeal, Sledge argued
that “the question is whether the State may obtain a conviction by proof of a
different act from the act upon which the grand jury indicted - - indeed by
proof of an act which the State has labeled ‘extraneous.’”  Id. at 254. 
However, there was “no evidence that the testimony presented to the grand jury
related to offenses other than those proven at trial.”  Id. at 256.

Although the State made elections in both Weatherby
and Sledge, but no elections were made in this case, Brenda did not
testify to any specific incidents from which the grand jurors could choose.  There
is simply no evidence that the “offenses presented to the grand jury differed
from the offenses proved at trial.”  Weatherby, 61 S.W.3d
at 736; see Sledge, 953 S.W.2d at 256.  The trial court did not abuse
its discretion by denying Jackson’s motions to quash.  See Weatherby,
61 S.W.3d at 736; see also Sledge,
953 S.W.2d at 256.  We overrule Jackson’s second issue.

ABILITY TO HEAR THE EVIDENCE AND CONFRONT
WITNESSES

            In issue three, Jackson contends that
he could not hear the evidence presented at trial or confront the witnesses
against him in violation of article 38.31 of the Code of Criminal Procedure,
the Sixth and Fourteenth Amendments of the United States Constitution, and article
1, section 10 of the Texas Constitution.  

            At trial, Jackson informed the trial
court that he was having difficulty hearing the proceedings.  The trial court
obtained a set of headphones, which Jackson used for the remainder of trial. 
After trial, Jackson filed a motion for new trial, alleging that he was deaf,
could not hear the proceedings, and did not receive “adequate hearing devices,”
thereby depriving him of the rights to “be confronted by his accusers,” “fully
understand the nature of the proceedings,” and “take part in his own defense.”

            At a hearing on the motion, Jackson testified that he has an 82.5 percent hearing loss and completed a sign language
course.  He was not fluent, but could understand sign language when used slowly. 
He received an award for his ability to work despite his inability to hear
without hearing aids.  During voir dire, he could not hear the panel’s responses. 
When using the headphones, he could hear the witnesses, but could not hear the
testimony of the sexual assault nurse examiner when she turned to draw diagrams
on the board, the testimony of witnesses when the microphones went out, or a
video that had been played.  He received headphones on the second day of trial.

            On cross-examination, Jackson told the
prosecutor that he could not hear her, that she needed to speak slowly so he
could read her lips, and that the “high pitch” of her voice caused him to have
trouble hearing.  When asked, Jackson later told the prosecutor, who was using
a microphone, that he could hear her because she was close to him and he was
reading her lips.  He admitted that he had appeared before the trial court
several times before trial, including arraignment and pretrial hearings.  He
claimed that, during his bail hearing, he advised the trial court of his
hearing problems. He had not previously informed the trial court of his 82.5
percent hearing loss, but explained that he had not been asked.  Even after
receiving the headphones, he told his attorney that he was having problems
hearing and his attorney expressed his own hearing difficulties.  They informed
the judge who instructed them to tap on the microphones to make them “work
properly.”  He did not tell the trial court of the need for an interpreter, but
explained that he cannot “understand sign very fast.”  Neither did he ask for
any form of writing regarding the witnesses’s testimony.

            On redirect, Jackson stated that his
previous court appearances took place at the bench, which enabled him to read
the judge’s lips.  On re-cross, Jackson stated that he can hear with his
hearing aids when he is “out in the open where there’s not so much of this
bouncing around in a room with background noise.”

The prosecutor testified that for the first time during
a break, Jackson advised the trial court of his hearing problems.  The trial
court offered to search for a hearing device to plug into the sound system. 
Upon return from the break, the trial court told Jackson that he would have to
contact someone to obtain a hearing device.  Defense counsel did not object to
proceeding with voir dire until a device could be obtained.  When the device
was provided, the trial court inquired as to whether Jackson could hear and the
defense confirmed that he could hear fine.  The defense made no other
indications that Jackson was having trouble hearing.  

The trial court placed his own recollection on the
record, which he subsequently detailed in findings of fact and conclusions of
law.  The trial court’s findings of fact state that: (1) before trial, it was
not advised of Jackson’s hearing impairment, testimony regarding an impairment
was not presented, and it was not apparent that Jackson had any difficulty
hearing; (2) in the morning on the first day of trial, defense counsel advised
the trial court that Jackson was having trouble hearing; (3) defense counsel
did not object to proceeding until a hearing device could be obtained; (4)
during lunch, Jackson received a set of headphones attached to an audio device
plugged into the sound system and indicated that “he could hear fine”; (5)
Jackson used the device during the remainder of trial; (6) it was not apparent
that Jackson had any further trouble hearing and there were no additional
objections on the issue; and (7) Jackson “appeared to confer with his attorney
during the trial without difficulty and thus it was not apparent to the Court
that he had difficulty hearing during the rest of the trial.”  

            The trial court’s conclusions of law
state that: (1) the trial court “devised a suitable remedy” to which Jackson
and his counsel agreed; and (2) Jackson was not denied due process, the
opportunity to confront witnesses, the “right to participate in his trial or
the ability to understand the proceedings in his case.”  The trial court denied
 Jackson’s motion.                                       

            On appeal, Jackson argues that he
qualifies as a “deaf person;” thus, the trial court was required to either provide
an interpreter or, if the defendant is unable to understand sign language,
“fashion a remedy suitable to overcome the defendant’s disability.”  Despite
the provided headphones, Jackson maintains that he could not hear “essential
portions” of the trial.  

            A trial court must provide an
interpreter for a deaf person.  See Tex.
Code Crim. Proc. Ann. art. 38.31(a) (Vernon Supp. 2008).  “The statute implements
the constitutional right of confrontation, which includes the right to have
trial proceedings presented in a way that the accused can understand.”  Salazar v. State, 93 S.W.3d 339, 340 (Tex. App.—Texarkana 2002, pet. ref’d).  If the defendant cannot understand sign
language, the trial court must “fashion a remedy suitable to overcome the
defendant’s disability.”  Lincoln v. State,
999 S.W.2d 806, 809 (Tex. App.—Austin
1999, no pet.).  “A defendant’s failure to object or request relief does not waive
his confrontation right if it is otherwise apparent that he cannot hear or
understand the proceedings.”  Id.

In Lincoln, Lincoln argued that the trial court failed to
“make proper accommodations for his hearing impairment,” depriving him of his
right to confront witnesses and right to an interpreter.  See id. at
807.  Lincoln was not deaf, but had
difficulty hearing.  Id. at 809.  During trial, he advised the trial
court of this problem.  Id.  The trial court allowed Lincoln to move or
the “speakers repeated themselves to permit [Lincoln] to hear.”  Id.  Lincoln “did not indicate at the time that these arrangements were
unsatisfactory.”  Id.  He was also “addressed by the court and responded
appropriately, indicating that he heard and understood what was said,” and “twice
took the stand and testified without difficulty.”  Id. at 809-10.  Only
after trial ended did Lincoln tell the trial court that he could not hear much
of the time.  Id. at 810.

Because the trial court observed Lincoln
throughout trial, it was in the “best position to judge the credibility of [Lincoln’s] claim that he did not hear the proceedings.”  Id.  “While the failure of
appellant or his attorney to tell the court earlier that appellant could not
hear the proceedings is not a bar to raising the issue on appeal, it is
relevant to the question whether the district court knew or should have known
that additional remedies were needed.”  Id.  The Austin Court held
that, “[c]onsidering what the district court was told and observed during the
trial, we are not persuaded that the court failed to take constitutionally
adequate steps to assure that [Lincoln] heard and understood the proceedings.” 
 Id.

In Salazar, Salazar complained that “when it became apparent he could not hear the
witnesses because of his hearing impairment, the court was required to provide
him an interpreter or some other means of communication that would permit him
to participate in the proceedings.”  Salazar, 93 S.W.3d at 340.  However, “Salazar
was addressed by the court or by counsel and responded appropriately,
indicating that he heard and understood what was said.”  Id. at 341.  Not
until the victims finished testifying did Salazar tell the trial court that he
could not hear the testimony.  See id.  “Until then the trial judge had
every reason to believe Salazar was able to understand the proceedings and
testimony, and no reason to the contrary.”  Id.  Thus, the trial court “could
not be expected to take action to ensure that the testimony’s content was
effectively communicated to Salazar.”  Id.  Because the trial court was
in the best position to judge the credibility of Salazar’s complaint, the Texarkana Court was “not persuaded [that] the court failed to take constitutionally adequate
steps to ensure Salazar heard and understood the proceedings.”  Id.

Jackson briefly
testified outside the jury’s presence as to proceeding or resting his case. 
His attorney asked to be informed if Jackson could not hear him.  The record
indicates that Jackson did not have difficulty testifying, but responded
appropriately and appeared to hear and understand what was being said.

Jackson had
also appeared before the court on several occasions before trial and never
indicated that he could not hear or understand what was being said.  Once Jackson advised the trial court of his
hearing difficulties, the trial court provided the set of headphones connected
to the sound system.  According to the record, this was done before voir dire. 
The trial court asked the defense if the device satisfied Jackson and counsel
responded that Jackson could hear fine.  He did not indicate either at that
time, or any other time, “that these arrangements were unsatisfactory.”  Lincoln,
999 S.W.2d at 809.  Thus, the trial court
had every reason to believe that Jackson could hear and understand the
proceedings and, without information to the contrary, could not be expected to
take any other action.  Only after trial ended did Jackson inform that trial
court of his 82.5 percent hearing loss or his inability to hear portions of the
proceedings.  His failure to inform the trial court, at an earlier time, that
he could not hear the proceeding, is relevant to the whether the trial court
knew or should have known of Jackson’s need for “additional remedies.”  Id.    

Having observed Jackson throughout trial, the
trial court was in the “best position to judge the credibility of [his] claim
that he did not hear the proceedings.”  The record does not indicate that the trial
court “failed to take constitutionally adequate steps to assure that [Jackson] heard and understood the proceedings.”  Lincoln, 999 S.W.2d at 810; see Salazar, 93 S.W.3d
at 341.  We overrule issue three.




Because we have overruled Jackson’s three issues,
we affirm the judgment in each of the six cases listed above.              


                   

  

FELIPE REYNA

Justice

Before Chief Justice
Gray,

Justice
Vance, and

Justice
Reyna

Affirmed

Opinion delivered and
filed September 3, 2008

Do not publish

[CRPM]

 









[1]               “Brenda Daniels” is a pseudonym.  





[2]               Brenda also testified that, on two
occasions, Jackson made her watch a pornographic film.  When Brenda was in
eighth grade, Jackson attempted to penetrate her vagina with his penis on two
occasions, once in the fall of 2004 and once in April 2005.  Both acts occurred
in Brenda’s bedroom.  She and Jackson were unclothed.  Jackson was not charged
with penetrating Brenda’s sexual organ with his sexual organ.